**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| Tariq Hamadneh, M.D., | Civil Action No. 4:26-cv-335-JD-TER _____ |
| Plaintiff, | |
| Vs. | **COMPLAINT** |
| Grand Strand Regional Medical Center, LLC, and HCA Healthcare, Inc., | **(Jury Trial Demanded)** |
| Defendants. | |

Plaintiff Dr. Tariq Hamadneh, M.D. ("Dr. Hamadneh" or "Plaintiff"), by and through counsel, alleges as follows against Defendant Grand Strand Regional Medical Center, LLC d/b/a Grand Strand Regional Medical Center ("Grand Strand," "GSRMC," or "Defendant") and HCA Healthcare, Inc. ("HCA").

## NATURE OF THE ACTION

1.     This is an action arising from Defendants' discriminatory and retaliatory termination of Plaintiff's residency contract and appointment in its ACGME-accredited General Surgery residency program, and Defendants' failure to follow the contractually promised due process and good-faith remediation procedures.

2.     Plaintiff is a surgeon-in-training of Palestinian/Arab ancestry. Defendant, through its agents and decisionmakers within the residency program and hospital administration, subjected Plaintiff to disparate treatment, hostile and exclusionary training conditions, pretextual discipline, and ultimately dismissal, because of his race/ancestry and protected complaints, in violation of 42 U.S.C. § 1981.

1

3.     Defendants' dismissal decision also breached Plaintiff's written Graduate Medical Education Trainee Agreement (the "Agreement") and the institution's Graduate Medical Education Manual (the "GME Manual"), which the Agreement requires Plaintiff to read and comply with and which Defendants use as the governing policy framework for remediation, due process, and grievance procedures.

4.     Plaintiff seeks, above all, immediate injunctive relief and reinstatement to the residency program (or equivalent status sufficient to preserve his training and immigration status), along with declaratory relief and damages.

5.     Plaintiff's need for emergency relief is acute. Plaintiff is a physician on a J-1 visa sponsored through Educational Commission for Foreign Medical Graduates (ECFMG). After Defendants' dismissal and final appeal decision, Plaintiff received notice that his sponsorship would be terminated, with a grace period and an end date of February 1, 2026. Plaintiff faces imminent loss of lawful status (provided by J1 visa) by February 1, 2026, absent reinstatement or equivalent relief.

6.     Plaintiff is the father of two young children, and his wife is pregnant with their third child, expected in March. Defendants' actions place Plaintiff and his family at immediate risk of deportation, loss of housing, loss of medical coverage, and catastrophic disruption of Plaintiff's medical career.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over Plaintiff's federal claim under 42 U.S.C. § 1981 pursuant to 28 U.S.C. §§ 1331 and 1343.

8.    This Court has supplemental jurisdiction over Plaintiff's related South Carolina law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

9.    Venue is proper in the Florence Division pursuant to 28 U.S.C. § 1391(b) because Defendants operate in this District and a substantial part of the events and omissions giving rise to these claims occurred within the Florence Division, including in Horry County, South Carolina, where Grand Strand operates and where Plaintiff trained and was dismissed.

## PARTIES

10.    Plaintiff Dr. Tariq Hamadneh, M.D. is a resident of Myrtle Beach, South Carolina. He is a physician and surgeon-in-training who entered Defendants' residency program as a categorical resident and performed clinical duties at Grand Strand.

11.    Defendant Grand Strand Regional Medical Center, LLC, doing business as Grand Strand Regional Medical Center, is a South Carolina healthcare institution and sponsoring/participating site of an ACGME-accredited general surgery residency program affiliated with HCA Healthcare/Mercer University School of Medicine (as reflected on Defendants' ECFMG remediation notification). Defendant Grand Strand employs and supervises residents, controls their training environment, and is a party to Plaintiff's Agreement.

12.    Defendant HCA Healthcare, Inc. ("HCA") is a for-profit healthcare corporation that owns, operates, and exercises centralized control over graduate medical education ("GME") programs at HCA-affiliated hospitals, including Grand Strand. HCA promulgates and enforces standardized GME policies, manuals, remediation templates,

and due-process procedures that govern resident discipline, remediation, appeal, and dismissal.

## **FACTUAL ALLEGATIONS**

13.     On or about June 20, 2023, Plaintiff and Defendant Grand Strand entered into a written Graduate Medical Education Trainee Agreement (Contract GRSTR-291753) ("Agreement"). The Agreement states that Plaintiff's appointment term would commence July 1, 2023 and would end June 30, 2026, absent earlier termination or extension.

14.     The Agreement required Plaintiff to "read, understand and abide by" all policies, manuals, rules, and regulations of the Hospital and Program as they exist and may be amended.

15.     The Agreement expressly contemplates that certain adverse actions and disputes—including promotion, graduation, and related decisions—are subject to "due process set forth in the GME Manual," and that disputes may be directed through grievance and due process procedures "in accordance with the GME Manual."

16.     The GME Manual (2025-2026 Resident & Fellow Manual) includes a "Right to Due Process and Appeal" and a "Resident/Fellow Due Process Policy," providing that residents notified in writing of decisions including remediation, dismissal, suspension, non-renewal, and non-promotion have the right to appeal under due process procedures.

17.     The Manual's Due Process Policy requires, among other things, that (i) the resident submit a written appeal within a short time window after receipt of the adverse action; (ii) the Designated Institutional Official ("DIO") or designee gather relevant information and may appoint an impartial panel outside the resident's program; and (iii)

the DIO issue a written response within a stated timeframe, with the DIO's decision described as final.

18.     Defendants, through these writings and policies, held themselves out as operating an ACGME-compliant training environment that supports residents through supervision, feedback, remediation when necessary, transparency, and psychological safety.

19.     HCA maintains a corporate Graduate Medical Education governance structure that controls, standardizes, and supervises residency programs across HCA-affiliated hospitals, including Grand Strand.

20.     The GME Manual governing Plaintiff's rights, including due process, remediation, and appeal, is an HCA-authored and HCA-mandated manual, not a hospital-specific document.

21.     HCA requires affiliated hospitals to utilize standardized remediation templates, corrective action plans, and reporting mechanisms, including communications with ECFMG regarding resident status and remediation.

22.     The Designated Institutional Official ("DIO") who adjudicated Plaintiff's appeal operated within HCA's GME governance framework and exercised authority delegated and structured by HCA.

23.     HCA's Human Resources function was directly invoked in Plaintiff's case, including escalation of allegations outside ordinary academic channels, consistent with HCA's centralized HR oversight model.

     a.  HCA personnel and systems materially participated in, influenced, or ratified: Plaintiff's remediation classification;

5

    b.   The framing of alleged "patient safety" concerns;

    c.   Reporting to ECFMG; and

    d.   The final dismissal decision following appeal.

24.    HCA knew or should have known that termination of a J-1 resident physician would trigger immediate immigration consequences, yet ratified or permitted Plaintiff's dismissal without corrective intervention.

25.    Plaintiff successfully progressed through training from PGY3 to PGY-4 and, during the relevant period, achieved a high level of academic performance, including the highest score in his department on the 2025 ABSITE examination (Plaintiff's record reflects a 79th percentile score).

26.    Plaintiff also received positive feedback from multiple faculty members on clinical performance, including after his reinstatement in 2025.

27.    Dr. Antonio P. Pepe, M.D., a senior trauma and acute care surgeon and Trauma Medical Director involved in the residency program, directly supervised Plaintiff and states—based on personal observations and inquiry with hospital quality/safety departments—that:

    a.   Plaintiff complied with remediation recommendations communicated to him after reinstatement

    b.   No concerns about Plaintiff's technical performance, professionalism, or patient care were raised with Dr. Pepe during the relevant period;

    c.   Quality, Patient Safety, and Risk Management personnel reported no documented patient safety events, quality concerns, adverse outcomes, or anonymous safety reports involving Plaintiff; and

d.  Assertions that Plaintiff was a "patient safety risk" were not supported by objective data or institutional review processes.

28.     Plaintiff is Palestinian/Arab. During his time at Grand Strand, he experienced repeated mistreatment and exclusion from operative opportunities and training that he reasonably perceived—and that colleagues also perceived—as targeted.

29.     Plaintiff reported that certain attendings, including Dr. Mia Klein, repeatedly excluded him from operating room opportunities, reassigned cases away from him, and spoke to him in a hostile and demeaning manner, with differential treatment compared to similarly situated peers.

30.     Plaintiff raised concerns through the program chain of command, including to the Program Director, about exclusion and unfair treatment. No effective corrective action was taken, and the conduct escalated. He was sent home once he tried to discuss the situation with Dr. Klein. Dr. Klein has expressed in multiple meetings that she did not want to proceed with Plaintiff's training.

31.     Another resident of Middle Eastern background (Syrian) was treated similarly by the same attending physician during at least one rotation with Plaintiff, including exclusion both of them from the operating room.

32.     Plaintiff's complaints about mistreatment, biased evaluations, and unfair discipline constitute protected activity, including opposition to discrimination and complaints seeking fair treatment and due process.

33.     At or near Plaintiff's end-of-year evaluation on June 12, 2025, Plaintiff was informed that dismissal was being pursued, without a clear explanation supported by documented deficiencies.

34.     Plaintiff appealed through available institutional processes.

35.     DIO reviewed his case and determined Plaintiff remained in good standing, and that Plaintiff was reinstated effective July 2, 2025.

36.     Within days of reinstatement, Plaintiff was again targeted for discipline.

37.     Between July 7 and 17, 2025, he received evaluations through the program's system (SIMPLE/New Innovations) from Dr. Klein and Dr. O'Field that he alleges were false, misleading, and retaliatory. Immediately after his reinstatement, both submitted similar falsified feedback in an attempt to belittle his performance.

38.     Plaintiff reported those evaluations and their inaccuracies to program leadership, Human Resources, and outside bodies, and requested access to what was written and relied upon. Defendants denied him access to certain evidence used against him.

39.     Dr. Klein and Dr. O'Field escalated their allegations and directly reported him to Human Resources for "patient safety," bypassing the normal GME/Program Director pathway. He was denied to be able to see the HR report against him.

40.     Defendants issued a Correction Action Plan dated July 22, 2025, stating: "Dr. Hamadneh extubated a patient … without notifying an attending physician," and further stating the program had a "zero tolerance policy" for decisions like extubation without faculty discussion.

41.     Plaintiff disputes the characterization and contends the extubation was planned by the previous attending physician covering the night shift, evidence-based, documented, and performed with respiratory therapy and nursing support (after meeting the extubation parameters), and that the attending had not previously instructed Plaintiff

that notification was required in that manner for such planned extubations. Similar extubation decisions have been done by other senior residents and Nurse practitioners if the patient meets the criteria for extubation and in many occasions without letting the attending know and not being accused for patient safety. The patient had no adverse outcomes, and left the hospital the next few days.

42.     Defendants documented the plan on an Academic Remediation Template dated July 22, 2025, listing a "Duration of remediation" of 90 days and referencing multiple alleged deficiencies.

43.     This remediation plan contains language that appear copied from prior documents and did not reflect his actual performance during the reinstatement period.

44.     The remediation template is labeled "Non-punitive and ineligible for appeal," which directly violates the GME Manual's statement that residents notified of remediation have a "Right to Due Process and Appeal."

45.     Defendants also submitted a required ECFMG notification of remediation, reflecting remediation dates of July 7, 2025 to September 30, 2025 and repeating the same alleged deficiencies.

46.     Defendants' disciplinary escalation immediately after reinstatement—and the manner in which allegations were framed and processed—was retaliatory and discriminatory and was designed to create a paper trail for a predetermined termination.

47.     Plaintiff states that on October 30, 2025, he met with the Program Director, Dr. R. Welsey Vosburg, to discuss case numbers and future plans; Dr. Vosburg told him that he planned an outside pancreas rotation for Plaintiff in the next year, raised no

concerns that Plaintiff was at risk of dismissal, and told Plaintiff his expected graduation date was June 2027.

48.     Approximately two weeks later, on or about November 18, 2025, Plaintiff was called to a "mid-year evaluation" meeting at which he was presented with a dismissal letter stating he had not met ACGME requirements for progression.

49.     At that meeting, Plaintiff was told that the July 2025 evaluations were excluded from consideration due to concerns about their quality and that dismissal was based on subsequent evaluations. In fact, those subsequent evaluations were generally positive and supportive. Additionally, these evaluations were discussed previously in person with Dr. Vosburg and other medical leadership and all confirmed satisfactory progression and meeting the remediation plan requirements.

50.     Plaintiff timely appealed the dismissal; during the appeal process, he requested clarification about what information was being considered and whether there was documentation of alleged "patient safety" concerns; Defendants denied him access to the evidence and information being relied upon to dismiss him from the program.

51.     In Plaintiff's appeal meeting with the DIO on December 4, 2025, Defendants repeatedly focused on July 2025 incidents that Plaintiff believed had already been reviewed, clarified, resolved, and/or officially discounted.

52.     In a December 19, 2025 email to Plaintiff, Dr. Thomas Genuit, the Designated Institutional Official (DIO), stated the Defendants considered, among other things, Plaintiff's course of training, case log, faculty evaluations, documentation of meetings and concern cards, EPAs, milestone evaluations, SIMPLE feedback,

remediation documentation, and input from faculty and mentors—but stated that Plaintiff "does not have access to this information."

53.    Defendants did not provide a fair, transparent, good-faith opportunity to succeed after reinstatement.

54.    Additionally, according to Dr. Pepe,

   a.  No institutional quality/safety documentation supports labeling Plaintiff a patient safety risk;

   b.  There was an absence of meaningful engagement with Plaintiff regarding corrective action during the delay; and

   c.  The circumstances raise concern that the dismissal outcome was effectively predetermined after reinstatement.

   d.  One of the faculty expressed that if he gets reinstated again, the faculty member is planning to immediately report him to the American Board of Surgery; expressing the continuous efforts to keep him out of the training.

55.    On January 5, 2026, Plaintiff received notice that the DIO upheld the dismissal as a final decision.

56.    On January 9, 2026, Plaintiff received notice from ECFMG that his J-1 visa sponsorship would be terminated, with a grace period and an end date of February 1, 2026, creating imminent immigration consequences.

57.    On January 8, 2026, the DIO told Plaintiff he was attempting to identify another program for possible transfer and would support Plaintiff if he secured another position.

58.    On January 14, 2026, the DIO emailed Plaintiff that there was no plan to transfer him to another program.

59.    Absent immediate reinstatement or comparable relief, Plaintiff faces the imminent loss of lawful status (provided by J1 visa) by February 1, 2026, threatening removal from the United States back to Palestine, severe financial hardship, and irreparable damage to his medical career.

60.    Plaintiff has two young children and a pregnant wife due in March. The family faces imminent disruption, financial and emotional distress, and loss of stability caused directly by Defendants' unlawful conduct.

61.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer:

      a.  Past and future lost wages and benefits;

      b.  Out-of-pocket losses and relocation/immigration costs;

      c.  Emotional distress and mental anguish;

      d.  Reputational harm and professional loss; and

      e.  Loss of career opportunity and training progress.

62.    At all relevant times, Grand Strand and HCA functioned as joint employers of Plaintiff and/or as an integrated enterprise with respect to Plaintiff's residency training and employment.

63.    HCA and Grand Strand shared and exercised interrelated control over Plaintiff's employment, including:

      a.  Centralized human resources and disciplinary escalation;

      b.  Uniform GME policies governing remediation, appeal, and dismissal;

    c. Shared decision-making authority regarding resident continuation and termination;

    d. Centralized control over communications with accrediting and visa-sponsoring bodies; and

    e. Economic control over Plaintiff's compensation, benefits, and continued employment.

64.    Plaintiff's residency appointment, continued employment, and termination were subject to HCA-mandated policies and approval structures, rendering HCA liable as a joint employer and integrated enterprise participant.

65.    Even if HCA were not deemed a joint employer, HCA is independently liable because it ratified, approved, and adopted the discriminatory and retaliatory conduct carried out at Grand Strand.

66.    HCA:

    a. Knew the factual basis asserted for Plaintiff's dismissal;

    b. Knew of Plaintiff's complaints regarding unfair treatment and due-process violations;

    c. Knew of the absence of documented patient-safety or quality events; and

    d. Knew of the severe immigration consequences attendant to dismissal.

67.    Despite that knowledge, HCA affirmed the outcome, permitted Plaintiff's dismissal to stand, and allowed adverse reporting to ECFMG to proceed.

68.    Ratification of discriminatory and retaliatory acts subjects HCA to liability under 42 U.S.C. § 1981 and applicable state-law contract doctrines.

**FOR A FIRST CAUSE OF ACTION**
**Race/Ancestry Discrimination in Contracting - 42 U.S.C. § 1981**
**(Against Both Defendants)**

69.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

70.     Section 1981 guarantees all persons the same right "to make and enforce contracts" as is enjoyed by white citizens. "Make and enforce contracts" includes performance, modification, termination, and enjoyment of benefits, privileges, terms, and conditions of the contractual relationship.

71.     Plaintiff had a valid contractual relationship with Defendants through the Agreement and the residency appointment, including the associated terms and conditions established by Defendants' policies and manualized due process framework.

72.     Plaintiff, as an individual of Palestinian/Arab ancestry, is a member of a protected racial/ancestry group for § 1981 purposes:

73.     Defendants intentionally discriminated against Plaintiff on the basis of his race/ancestry in the terms and conditions of his residency training, evaluation, remediation, discipline, and ultimate contract termination, including by:

74.     Subjecting Plaintiff to exclusion from operative opportunities and a hostile training environment;

    a.  Discriminating against Plaintiff through unfair, retaliatory, and/or knowingly false evaluations;

    b.  Treating Plaintiff as a "patient safety risk" without objective supporting documentation while allowing similarly situated residents to continue training under similar clinical circumstances;

14

c.  Imposing punitive "zero tolerance" discipline framed as patient safety in a manner not applied consistently to others who are outside of Plaintiff's race/ancestry.

d.  Dismissing Plaintiff despite objective indicators of competence and progress and despite the absence of documented quality/safety events; and

e.  Failing to provide fair, transparent processes and support through the grievance process while moving toward a predetermined termination.

75.     Defendants' discriminatory conduct was a but-for cause of the adverse contractual actions, including the termination of Plaintiff's Agreement and appointment.

76.     As a direct and proximate result, Plaintiff suffered loss of income, loss of benefits, emotional distress, reputational harm, and severe immigration consequences.

77.     Plaintiff is entitled to declaratory relief, compensatory damages, punitive and injunctive relief including reinstatement, as well as an award of attorney's fees and costs.

## FOR A SECOND CAUSE OF ACTION
### Retaliation in Contracting - 42 U.S.C. § 1981
### (Against Both Defendants)

78.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

79.     Plaintiff engaged in protected activity when he complained to program leadership and hospital administration about mistreatment, biased and false evaluations, unfair discipline, and discrimination; he also complained to HR and outside bodies, including ACGME.

80.     Defendants materially interfered with Plaintiff's contractual relationship and employment/training conditions and ultimately terminated his contract and appointment because of Plaintiff's protected complaints, including by escalating allegations through HR, imposing disciplinary plans, withholding evidence, and dismissing Plaintiff.

81.     Defendants' retaliation was a but-for cause of Plaintiff's termination and related harms.

82.     Plaintiff is entitled to declaratory relief, compensatory damages, punitive and injunctive relief including reinstatement, as well as an award of attorney's fees and costs.

## FOR A THIRD CAUSE OF ACTION
### Breach of Contract
### (Against Both Defendants)

83.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

84.     The Agreement is a valid contract supported by consideration. Plaintiff performed his contractual duties by working as a resident physician, providing clinical services under supervision, complying with program requirements, and continuing to meet remediation expectations communicated to him.

85.     Defendants materially breached the Agreement and incorporated/associated policy commitments, including but not limited to:

a. Defendants failed to provide the due process and fair appeal procedures described in the GME Manual and referenced by the Agreement-particularly by withholding evidence it relied upon, declining to provide Plaintiff access

to information used against him, and failing to provide a fair, transparent process.

b. After reinstatement, Defendants did not provide a structured, good-faith remediation opportunity consistent with its stated educational purpose, and instead used remediation/corrective action as a pathway to predetermined dismissal.

c. Defendants labeled the remediation template "ineligible for appeal," conflicting with the GME Manual's statement that residents notified of remediation have a right to due process and appeal, depriving Plaintiff of the benefit of the bargain and inducing confusion and procedural disadvantage.

d. Defendants represented that Plaintiff's graduation could be June 2027 and discussed future rotations shortly before dismissal, while allegedly failing to provide contemporaneous documented deficiencies or warnings consistent with fair process.

86.    HCA is liable for breach of contract because it:

a. Authored and promulgated the GME Manual governing Plaintiff's contractual rights;

b. Intended residents, including Plaintiff, to rely on those promises; and

c. Exercised control over the procedures by which Plaintiff's contract was terminated.

17

    d.   Alternatively, Plaintiff was an intended third-party beneficiary of HCA's GME policies and due-process guarantees, which HCA breached by permitting and ratifying a procedurally defective dismissal.

87.    Defendants' breaches caused Plaintiff substantial damages, including loss of wages/benefits, loss of training opportunity, reputational harm, and catastrophic immigration consequences.

88.    Plaintiff seeks damages and specific performance/equitable relief including reinstatement.

## FOR A FOURTH CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Both Defendants)

89.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

90.    South Carolina law implies a covenant of good faith and fair dealing in the performance and enforcement of contracts.

91.    Defendants violated that covenant by exercising its contractual discretion over evaluations, remediation, discipline, and dismissal in a manner that was arbitrary, pretextual, retaliatory, and inconsistent with the contract's purpose and promised educational protections—effectively depriving Plaintiff of the benefits of his residency contract and due process rights.

92.    Plaintiff is entitled to damages and equitable relief.

**FOR A FIFTH CAUSE OF ACTION**
**Promissory/Equitable Estoppel**
**(Against Both Defendants)**
**(In the Alternative)**

93.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

94.     In the alternative to contract claims, Defendants made clear promises and representations upon which Plaintiff reasonably relied, including that:

    a.  Plaintiff was reinstated and would be afforded an opportunity to progress;

    b.  Plaintiff was expected to graduate in June 2027 and was being planned for future rotations; and

    c.  Defendants would follow defined due process and remediation procedures.

95.     Plaintiff relied on these promises by continuing training, foregoing alternative placements, maintaining immigration reliance on program continuation, and investing in his family's life in South Carolina.

96.     Injustice can be avoided only by enforcing Defendants' promises through equitable relief, including reinstatement.

**FOR A SIXTH CAUSE OF ACTION**
**Declaratory Judgment – 28 U.S.C. §§ 2201-2202)**
**(Against Both Defendants)**

97.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

98.     An actual controversy exists regarding the legality and enforceability of Defendants' dismissal decision and whether Defendants complied with the Agreement and governing due process policies.

99.    Plaintiff seeks a declaration that Defendants' termination of Plaintiff's residency appointment and contract was unlawful and/or in breach of the Agreement and that Plaintiff is entitled to reinstatement and other relief.

**REQUEST FOR INJUNCTIVE RELIEF**
**(PRELIMINARY AND PERMANENT)**

100.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

101.    Plaintiff will suffer irreparable harm absent immediate injunctive relief, including loss of lawful immigration status (provided by J1 visa), removal from the United States, inability to continue medical training, loss of career trajectory that cannot be fully compensated by money damages, reputational harm, and severe family hardship.

102.    Plaintiff has a likelihood of success on the merits based on the written contract/manual, the due process irregularities, the lack of objective safety documentation, the evidence of pretext and discriminatory/retaliatory motives, and the devastating, foreseeable consequences of dismissal for a J-1 resident.

103.    The balance of equities favors Plaintiff because reinstatement restores the status quo ante while the case is adjudicated; Defendants can supervise Plaintiff and evaluate performance under standard mechanisms.

104.    The public interest favors injunctive relief because it promotes fair, non-discriminatory training environments, adherence to institutional due process, and stability in graduate medical education systems.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

20

A.     Preliminary and permanent injunctive relief ordering Defendants to reinstate Plaintiff to the General Surgery residency program in good standing (or to an equivalent paid resident status with full institutional support sufficient to preserve training and immigration sponsorship while litigation proceeds);

B.     An order requiring Defendants to restore Plaintiff's residency appointment and contractual status, including access to evaluations, logs, and educational resources necessary to continue training;

C.     A declaration that Defendants' dismissal decision violated § 1981 and/or breached the Agreement and governing due process procedures;

D.     Compensatory damages in an amount to be determined at trial, including back pay, front pay (if needed), consequential damages, and emotional distress damages;

E.     Punitive damages on the § 1981 claims to the extent permitted by law, due to Defendants' willful and reckless disregard of Plaintiff's federally protected rights;

F.     Attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable authority;

G.     Pre- and post-judgment interest as allowed by law; and

H.     Such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues so triable.


(Signature Block on Last Page)

Respectfully submitted,

s/Jack E. Cohoon
Jack E. Cohoon (Fed. Bar No. 9995)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, Suite 200 (29201)
P.O. Box 1929
Columbia, South Carolina 29202
Telephone: (803) 904-7914
Fax: (803) 904-7910
jcohoon@burnetteshutt.law

**ATTORNEY FOR PLAINTIFF**

Columbia, South Carolina

January 30, 2026